UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Leonard J. Rosati,

Plaintiff,

vs. ORDER

Cleveland-Cliffs, Inc.,

Defendant. Civ. No. 01-1937(RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 21st day of March, 2003.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 18 U.S.C. §636(c), upon the parties' cross-Motions for Summary Judgment, and upon the Plaintiff's Motion for a Jury Trial.

At a Hearing on the Motions, the Plaintiff appeared by H. Jeffrey Peterson, and Andrew R. Peterson, Esqs., and the Defendant appeared by Robert T. Torgerson, and W. Eric Baisden, Esqs.

For reasons which follow, we grant the Defendant's Motion for Summary Judgment, deny the Plaintiff's Motion for Summary Judgment, deny the Plaintiff's informal Motion for Leave to Amend his Complaint, and deny the Plaintiff's Motion for a Jury Trial, as moot.

MAR 21 2003
... LETTEN, CLERK
... ENTD 3/21/03
MJK

## II. Factual and Procedural History

This action arises out of an announcement, on May 24, 2000, that LTV Steel Mining Company ("LTV") would be closing its facilities in Hoyt Lakes, Minnesota. The Defendant Cleveland-Cliffs, Inc. ("CCI"), managed LTV, and the Plaintiff was a CCI employee, who had been assigned, by CCI, to work at LTV.

As part of LTV's closure, CCI employees, who worked at LTV, were informed that, if they elected to retire, by no later than June 30, 2000, they would be entitled to receive monthly payments of $400.00, until they reached the age of 62, as a supplement to their retirement benefits. However, CCI also identified several "key" employees, who it needed to remain at LTV through the closing, and it offered those employees an incentive to remain at LTV after the deadline of June 30, 2000. Those key employees were warned that, if they elected to remain employed after that date, they did so with no guarantee of a permanent position at CCI. The incentives that those employees would receive, for opting to stay, were outlined in a document entitled "Benefits for Cliffs Mining Company and Cliffs Mining Services Company Employees Who are Terminated As a Result of the Shutdown of LTV Steel Mining Company" (the "Plan").

The Plan explained that, "[a]s a result of the shutdown of LTV * * * [CCI] salaried employees at LTV * * * will become eligible

for the" benefits contained in the Plan, "by continuing to work until their employment is terminated." See, Exhibit A attached to Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 1 [emphasis in original]. Under the Plan, "[e]very eligible employee w[ould] receive six months of basic severance pay continuation regardless of age and service." Id. The Plan also provided for three different severance pay supplements, with differing eligibility requirements.

The first of those supplements was the "70/80 Supplement," which is the one to which the Plaintiff believes that he is entitled. The 70/80 Supplement provides that employees whose years of service and age, when added together, total eighty or more[1] as of the end of the "Termination Period," were entitled to a $400.00 monthly supplement, until they reached the age of sixty-two. Id. The "Termination Period" was defined as "the six-month period which begins on the day following a salaried employee's employment termination on account of the shutdown of LTV Steel Mining Company." Id.[2] After reciting the various supplemental benefits, the Plan

---

[1]When the Plaintiff left CCI, he was over fifty years of age, and he had over thirty years of service with the company.

[2]In addition, the Plan had a "Rule of 65 Supplement," which provided the same monthly benefit to persons who "ha[d] at least 20 years of continuous service as of the last day worked * * * and years of service and age that total 65 or more but less than 80 as (continued...)

continued with provisions concerning the medical and life insurance benefits, vacation pay, and outplacement assistance programs, that were provided under the Plan. Id. at 2.

The next section of the Plan was entitled "Eligibility for Severance Benefits and Pension Enhancements." The first provision under that section was entitled "Offer of Continued Employment with a 'CCI Associated Employer,'" which was further divided into three subdivisions. Id. The first subdivision read as follows:

> If offered a "generally equivalent position" (before actual layoff) with same base pay and incentive opportunity, which is in Northeastern Minnesota, such employment offer shall cause the incumbent to be "ineligible" for basic severance pay and/or special retention benefits (but shall not cause ineligibility for 70/80 [or] Rule of 65 pension[s] if otherwise eligible).

Id.

The second subdivision, provided as follows:

> If offered a position that is "not generally equivalent" and/or a position that requires relocation from [the employee's] primary residence, outside of Northern Minnesota, [the]

(...continued)
of the end of the 'Termination Period.'" However, under that provision, the monthly supplement was subject to a reduction of $1.00 for every $2.00 "of income earned after retirement which exceed[ed] $17,000 in a calendar year." Plan, at 1. The third Supplement was the "30-Year Retirement" Supplement, which was available for persons who were "eligible for a 30-Year Early Retirement benefit," and provided that such persons would receive their "pension benefit at the date of retirement rather than at the end of the 'Termination Period.'"

> incumbent will have the option to: a) accept position with appropriate relocation assistance in lieu of basic severance pay and special retention benefits or b) elect voluntary termination with basic and special retention benefits.

Id.

Finally, the third subdivision read as follows:

> If offered employment with a CCI Associated Employer after [the] incumbent begins layoff and such employment (including relocation, if necessary) is accepted, the CCI employment shall serve as a mitigating event to the basic severance pay.

Id.

The Plan then provided information concerning whether the pension plan of an eligible employee, who accepted employment with a CCI associate employer after being terminated from LTV, would be fully credited in that new employment. Finally, the Plan provided information concerning the impact of the IRS Pension Plan Rules on the form of benefits payments under the Plan, noting that some employees' payments might be "in the form of a lump sum present value" payment, instead of "a monthly periodic payment," but that "[e]ach employee w[ould] be notified as to the actual form of payment allowable for their benefits." Id. at 3.

In June of 2000, Rich Novak ("Novak"), who is CCI's Vice President for Human Resources, Kurt Holland ("Holland") who is CCI's Manager of Employee Benefits, and John Tuomi ("Tuomi"), who was LTV's General Manager, met with the employees that had been

identified as "key" employees, including the Plaintiff. The Plaintiff claims that, as a result of that meeting, he understood that, if he were to retire by June 30, 2000, then he would be entitled to an additional $400.00 per month, until he reached the age of 62, but that, if he elected, instead, to remain at LTV, he would be entitled to the benefits outlined in the Plan. The Defendant claims that Novak also explained to the key employees, that they would only become eligible for the Plan benefits if they continued to work at LTV until such time as CCI terminated their employment. In any event, the Plaintiff elected to remain at LTV.

Then, in November of 2000, CCI offered the Plaintiff a position at the Wabush Mines, in Sept-Iles, Canada. After visiting that location, the Plaintiff decided not to accept the offer due, in large part, to the fact that it would require him to relocate his home. Relying on his reading of the second subdivision, under the Plan's provisions which concerned an "Offer of Continued Employment with a 'CCI Associated Employer,'" and which pertained to employees offered a position that required relocation to a location outside of Northern Minnesota,[3] the Plaintiff informed Robert J. LeRoux ("LeRoux"), who is CCI's Controller, that he was

[3]The parties agree that the Sept-Iles Canada location of the Wabush Mines is "outside of Northeastern Minnesota," and thus falls under this second provision.

electing "voluntary termination with basic and special retention benefits" which, he believed, entitled him to ten month's full pay, and a $400.00 per month pension add-on.[4] LeRoux informed the Plaintiff that he was not entitled to those benefits, because his employment had not been terminated by CCI but, instead, had resulted from the Plaintiff's own election.

Thereafter, the Plaintiff sent an electronic message to John Brinzo ("Brinzo"), who is the Chief Executive Officer of CCI, asking whether Brinzo agreed with LeRoux's position. Brinzo replied that he did, and explained to the Plaintiff that, if the Plaintiff had elected to terminate his own employment, he was not covered by the Plan. Thomas O'Neil, who was the President and Chief Operating Officer of CCI, also concurred in that interpretation. Faced with those opinions, the Plaintiff elected to continue working for CCI, and he remained at LTV until April 30, 2001,[5] at which time he voluntarily retired from CCI, and moved to Denver, Colorado, where he commenced a new job.

[4]We are unsure of where the ten month figure came from, as our reading of the Plan reveals that the severance pay was only six month's pay.

[5]The Plaintiff's last day of work at LTV was actually sometime in late March of 2001, but due to accrued vacation time, he continued to be employed by CCI until April 30, 2001.

The Plaintiff initially brought this suit in the St. Louis County District Court for the Sixth Judicial District of the State of Minnesota, as a State law contract action, claiming that the Defendant had wrongfully refused to pay him the benefits to which he was entitled under the Plan. Thereafter, the Defendant removed the action to this Court, under our diversity jurisdiction, see Title 28 U.S.C. §1332, and also on the ground that, because the Plan was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), the Plaintiff's State law contract claims were preempted.[6]

In the Motions before us, the Defendant seeks Summary Judgment on the grounds that the Plaintiff's State law contract action is preempted by ERISA. Alternatively, the Defendant argues that, even if the Plaintiff's claims were not preempted, it is, nonetheless, entitled to Summary Judgment because it complied with the plain meaning of the Plan's terms, when it denied the Plaintiff's claim

[6]Even in the absence of diversity jurisdiction, the Defendant could still have properly removed this case as presenting a Federal question. Generally, the "well-pleaded Complaint" rule bars the removal of an action filed in State Court, where the Federal question does not appear in the Complaint, but only in a defense to its allegations. See, e.g., Peterson v. E.F. Johnson Co., 2002 WL 1975907 (D. Minn. August 23, 2002). However, an exception to that rule "exists for certain types of federal regulations that completely preempt state laws," including ERISA. Id., citing Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987). "Thus, ERISA can be the basis for federal jurisdiction even when preemption is raised only in defense." Id.

for benefits. The Plaintiff disputes the Defendant's assertion that the Plan is governed by ERISA, and argues that he is entitled to Summary Judgment because, as a matter of law, the Defendant wrongfully denied him benefits under the Plan. The Plaintiff has also moved for a Trial by Jury.

III. Discussion

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Duffy v. McPhillips, 276 F.3d 988, 991(8th Cir. 2002); Schoolhouse Inc. v. Anderson, 275 F.3d 726, 728 (8th Cir. 2002); Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance, 207 F.3d 1026, 1028 (8th Cir. 2000); Austin v. Minnesota Mining and Manuf. Co., 193 F.3d 992, 995 (8th Cir. 1999); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Peter v. Wedl, 155 F.3d 992,996 (8th Cir. 1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Manufacturing Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No genuine issue of fact exists in such a case because "a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.3d 162, 163 (8th Cir. 1993).

As we have noted, the Defendant urges that the Plaintiff's State law contract claim is preempted by Federal law. Therefore, although we "give the benefit of all factual inferences to the plaintiff, a finding by the court that the plaintiff's claims are preempted by federal law would entitle the defendant to" Summary Judgment. Murphy v. Smithkline Beecham Animal Health Group, 898 F. Supp. 811, 813-14 (D. Kan. 1995). Accordingly, our analysis necessarily starts with that threshold argument, and we find the preemption of State law that the Defendant urges.

In support of its Motion for Summary Judgment, the Defendant asserts that its Plan falls squarely within the preemptive scope of ERISA. The Plaintiff disagrees, and contends that the Defendant has failed to present any evidence to show that it established or, in fact, even contemplated the establishment of an ERISA plan, and that, in any event, the Plan did not qualify as an ERISA employee benefit plan.

A. Standard of Review. When enacting ERISA, Congress included a preemption provision to "ensure[] that the administrative practices of a benefit plan w[ould] be governed by only a single set of regulations." Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 11 (1987), citing H.R.Rep. No. 93-533, p. 12 (1973). The enactment of that "provision was prompted by [the] recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating administrative activities," and that a "[a] patchwork scheme of regulation[s] would introduce considerable inefficiencies in benefit program operation, which," in turn, might lead employers to elect not to offer benefits, or to discontinue established benefit plans. Id. However, ERISA's preemptive effect only applies to qualifying benefit plans. See, Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 257 (8th Cir. 1994).

"An employer's decision to extend benefits does not constitute, in and of itself, the establishment of a ERISA plan." Id., citing Wells v. General Motors Corp., 881 F.2d 166, 176 (5th Cir. 1989). In order to determine whether a particular employee benefit plan falls within ERISA's ambit, a reviewing Court's "pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits." Id. If such a scheme is necessary, then an employee benefit plan

falls within the preemptive scope of ERISA. In Crews v. General American Life Insurance Co., 274 F.3d 502, 505 (8th Cir. 2001), the Court of Appeals for the Eighth Circuit enumerated the factors that a Court should consider in reaching that determination, and explained as follows:

> When determining whether payments require an ongoing administrative scheme, we consider whether the payments are one-time lump sum payments or continuous payments, whether the employer undertook any long-term obligation with respect to the payments, whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees, and whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees.

Id., citing, Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 934-35 (8th Cir. 1999), Kulinski v. Medtronic Bio-Medicus, supra at 256-58.

Under this analysis, "[t]he last factor is frequently determinative." Gilmore v. Silgan Plastics Corp., 917 F.Supp. 685, 688 (E.D. Mich. 1996).

B. Legal Analysis. The Plaintiff has advanced two arguments against the Defendant's urging that his State law based claim is preempted by ERISA. First, the Plaintiff contends that "there is no evidence that [the] Defendant established or contemplated a plan pursuant to ERISA," because the Defendant has not satisfied the "numerous reporting provisions and fiduciary requirements" required by ERISA. Plaintiff's Memorandum of Law in Opposition to Defen-

dant's Motion for Summary Judgment, at 10. Second, the Plaintiff argues that the Plan did not fall under ERISA, because payments of benefits under the Plan did not require an on-going administrative scheme. We address each argument in turn.

1. Whether the Plan Was an Employee Benefit Plan as Defined by ERISA.

According to the Plaintiff, ERISA requires employers to provide those employees, who are eligible for benefits under a plan, a "summary plan description," as well as other information, and to file that plan with the Secretary of Labor. Id. at 10, citing Title 20 U.S.C. §1021(a)-(b). The Plaintiff maintains that there is "no evidence that [the] Defendant provided [him] with a summary of the plan," "apprised [him] of his rights and obligations under the plan," or ever filed the Plan with the Secretary of Labor. Thus, the Plaintiff maintains that the Plan cannot be an employee benefit plan as defined by ERISA.

A similar argument was raised by the plaintiff, in Peterson v. E.F. Johnson Co., 2002 WL 1975907 at *3, (D. Minn., August 23, 2002), where he contended that an employee benefit plan was not governed by ERISA, because the plan's administrators had "failed to comply with the reporting and disclosure requirements of ERISA." The Court disagreed, and explained that "th[o]se requirements do not determine whether ERISA applies," and were "relevant to whether

the Program complie[d] with ERISA, not [to] whether ERISA applie[d] to the Program." Id. In reaching that decision, the Court relied upon Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (adopted by the Eighth Circuit in Harris v. Arkansas Book Co., 794 F.2d 358, 360 (8th Cir. 1986)); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 104 (1989)(treating termination payment plan as an ERISA plan, even though the employer, who had been unaware that ERISA applied to that plan, had not set up a claims procedure, or complied with ERISA's reporting, and disclosure requirements).

In Donovan, the Court of Appeals for the Eleventh Circuit was faced with the question of whether a group insurance trust program was an "employee benefit plan," under ERISA. That Court noted that, in addition to providing a standardized regulatory system for employers who offered benefit programs to their employees, ERISA was also designed "to protect working men and women from abuses in the administration and investment of private retirement plans and employee welfare plans." Id. at 1370. Therefore, "[w]ith few exceptions * * * ERISA applies to any" "(1) * * * 'plan, fund or program' (2) established or maintained (3) by an employer * * * (4) for the purpose of providing * * * benefits (5) to participants or their beneficiaries." Id. at 1371.

In Donovan, as here, the question arose as to whether, when the employer had not complied with the writing, reporting, or disclosure requirements of ERISA, a plan could, nevertheless, fall within ERISA's coverage. The Court construed that argument as asserting that the "established or maintained" element of the above-recited test had not been met. The Court explained that "ERISA's coverage provision reaches 'any employee benefit plan if it is established or maintained'" by an employer "engaged in any activities or industry affecting commerce." Id. at 1372. The Court held that it was only after it was determined that a plan was covered by ERISA, that "the Act's fiduciary and reporting provisions * * * require[d] the plan to be established pursuant to a written instrument." Id. Accordingly, the Court found that those reporting requirements were not, in and of themselves "prerequisites to coverage under the Act." Id.

However, the Court explained that the mere decision, by an employer, to offer benefits of the type that might be covered by ERISA did not mean that any plan, which is later developed by that employer, would be governed by ERISA. Instead, the Court held that a plan is "established" under ERISA "if from the surrounding circumstances a reasonable person c[ould] ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Id. at 1373.

The plan before the Court, in Peterson, satisfied the Donovan test. There, although the source of financing was not expressly stated in the Plan, the Court found that a person could reasonably identify that the funding source of any benefits was "the same as the source of the participant's salary and medical benefits before termination: the company's general assets." Id. at *2. Likewise, the Court held that, notwithstanding the fact that the plan did not outline the procedures an employee had to follow to receive benefits, a reasonable person would know who to approach to discover that information. Thus, as a reasonable person could ascertain all of the required information from the plan, the plan was "established" and the employer's "fail[ure] to comply with the reporting and disclosure requirements of ERISA," did not take the plan outside of ERISA's preemptive scope. Id. at *3.

The application of the Donovan factors to this case, results in the same conclusion. A reasonable person could ascertain the intended benefits, and beneficiaries, of the Plan, as they were expressly outlined in its provisions. In addition, a reasonable person could also identify the source of those benefits, as there is no evidence to suggest that it was other than "the same as the source of the participant's salary and medical benefits before termination: the company's general assets." Peterson v. E.F. Johnson Co., supra at *2. Likewise, as was the case in Peterson, even

though the Plan did not explicitly contain the procedures an employee must follow to obtain benefits, a reasonable person could ascertain who to approach to ascertain that procedures. The employees who might be eligible for benefits under the Plan were spoken to, about its benefits, by CCI's Vice President for Human Resources, and Manager of Employee Benefits, as well as LTV's General Manager -- any of whom the employee could reasonably approach to determine what process he, or she, had to pursue to claim benefits.

Thus, we conclude that the Plan was "established," despite the Defendant's failure to comply with ERISA's registration requirements, and we conclude that the Plan was an "employee benefit plan" as defined under ERISA. Id. at 1371. Accordingly, we proceed to a consideration of whether the payment of benefits under the Plan required an on-going administrative scheme.

2. Whether the Plan Requires an On-Going Administrative Scheme.

As we have previously related, in determining whether a plan requires an on-going administrative scheme, we must consider four factors: whether the payments under the plan are one-time lump sum, or continuous, payments; whether the employer undertook any long-term obligation with respect to the payments; whether the severance payments come due upon the occurrence of a single,

unique event, or any time that the employer terminates employees; and whether the plan requires the employer to engage in a case-by-case review of the employees. The Plaintiff maintains that the Plan did not satisfy those requirements. As urged by the Plaintiff, the Plan was created to deal with a single event -- the closing of LTV -- and, upon an employee's termination, his or her basic and special retention benefits were paid in a one-time lump sum payment, such that the Defendant did not undertake any long-term obligations with regard to those benefits. In addition, the Plaintiff claims that administration of the Plan did not require a case-by-case review of each employee. We disagree.

While the Plan was certainly created to deal with the closing of LTV, we conclude that the closing was not a single, one-time event, of the type that excludes an employee benefit plan from ERISA's protections. The question we are obligated to ask is not simply whether the plan was created in response to a particular event, but rather, "whether the severance payments **come due** upon the occurrence of a single, unique event or any time that the employer terminates employees." Crews v. General American Life Ins. Co., supra at 506 [emphasis added].

We think that the distinction is made clear by a consideration of the reasoning, which was employed by the United States Supreme Court in Fort Halifax Packaging Company, Inc. v. Coyne, supra.

There, the issue was whether a State statute, which required all employers to provide a one-time severance payment to employees in the event of a plant closing, was preempted by ERISA. In concluding that ERISA did not apply to that statute, the Supreme Court reasoned as follows:

> The Maine statute neither establishes, nor requires an employer to maintain an employee benefit **plan.** The requirement of a one-time lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well **never** have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

Id. [emphasis in original, footnote omitted].

Here the Plan, even though developed in response to LTV's closure, required more than a "single set of payments to employees" at one time. Here, severance payments would come due "any time that the employer terminates" one of the employees that remained at LTV