after June 30, 2000. Crews v. General American Life Ins. Co., supra at 506. Since these employees "might be terminated singly or in groups of indeterminate size," "at any time," "for as long as [the Defendant] ha[d] employees" at LTV, "[t]he severance plan as written contemplates a continuing, albeit possibly sporadic, need for processing requests for benefits and making payments." Emmenegger v. Bull Moose Tube Co., supra at 935. As a result, we find that the Plan, here, was not developed, as the Plaintiff asserts, in response to a single, unique event, of the type that would take the Plan outside of ERISA's coverage.

Likewise, we are unable to agree with the Plaintiff's assertion that the benefits, which were paid under the Plan, were made in a one-time, lump sum payment. In Fort Halifax, the statute at issue provided that, upon the plant's closure, the employer was to make a single, specified, payment to each employee. However, here, while it is true that each employee would receive a lump sum payment, of six month's salary, as a severance payment, the Supplemental benefit plans might be paid on a monthly basis, over a series of years.[7] Those provisions clearly provide for a long-term obligation on the Defendant's part. For example, an employee might be

---

[7]We say "might" because, as we previously related, the Plan did provide that IRS Pension Plan Rules could cause "the actual payment(s) [to] be in the form of a lump sum present value rather than a monthly payment." Plan, at 3.

eligible for the 70/80 Supplement at age 55, which would entitle him or her to seven years of monthly supplement payments. A seven-year obligation to make such payments is clearly a long-term obligation. See, Fort v. St. Paul Fire and Marine Ins. Co., 2002 WL 1127657, at *4 (D. Minn. May 28, 2002)(payment of benefits "over the span of 46 weeks required [the employer] to undertake the long-term obligation of making its payments * * * throughout that time period."). The fact that the Defendant has obligated itself to making years of monthly payments to each employee, each of whom might be terminated at a different time, with a differing number of remaining months of eligibility, clearly demonstrates that the Plan did not provide for a single, lump-sum payment to each beneficiary, and that the Defendant had undertaken a long-term obligation to those beneficiaries.

Further, under the Rule of 65 Supplement, the $400.00 monthly supplement was subject to a reduction of $1.00 for every $2.00 of income over $17,000, that was earned in a single calendar year. As a consequence, the Defendant would be obligated to keep itself apprised of any income, which was earned by an employee who was entitled to benefits under this provision, for the duration of the period during which he, or she, was entitled to supplemental benefits. Likewise, if the terminated employee was re-employed by a CCI employer, such employment would "mitigate" the payment of sev-

erance benefits, which would obligate the Defendant "to monitor the [terminated employee's] employment status throughout the time period of entitlement to installment payments." Id. Those considerations also demonstrate that long-term obligations had been undertaken by the Defendant.

Since each employee would become eligible for benefits, under the Plan, upon his or her own termination, and not at some shared point in time, and since the Plan expressly provided for monthly payments over a number of years after that termination, with the amount of those monthly benefits being subject to change over time, we conclude that the first three elements of the Crews test weigh heavily in favor of a finding that the Plan was an ERISA plan.[8]

However, the Plaintiff has also argued that the Plan did not require a case-by-case review of the employees, for eligibility, because the only determinations, that had to be made under the Plan, were mechanical determinations, which did not require the

---

[8]In part, we view that the Plaintiff's error, in asserting that the Plan provided only for a lump-sum payment that did not require any on-going involvement by the Defendant, as arising from his focusing, too heavily, on how the Plan applied to him. It may be true that, if the Plaintiff was otherwise qualified for supplemental benefits under the 70/80 Supplement at the time of his termination, he would have been entitled to the six months of severance pay, and a specific number of $400.00 per month supplemental payments, that would have been paid to him in a lump sum. But our task requires a consideration of the Plan as a whole, and not just the Plan's purported application to the Plaintiff.

exercise of any discretion. As we have related, this last factor is "frequently determinative" of whether an employee benefit plan falls within ERISA's scope. Gilmore v. Silgan Plastics Corp., supra at 688. Not surprisingly, therefore, the Defendant disagrees, and maintains that the Plan required a case-by-case review of each employee for eligibility purposes.

"Where severance payments are not 'virtually automatic,' * * * decisions regarding eligibility for severance benefits and the amount of such benefits are made with the exercise of judgment." Fort v. St. Paul Fire and Marine Ins. Co., supra at *5. The Defendant urges that the administration of its Plan required it to make several, distinct, determinations, which necessitated a case-by-case review of each terminated employee. According to the Defendant, the first of those determinations was the initial decision as to which employees it wanted to retain past June 30, 2000 -- which, in turn, was a decision as to which employees it wanted to be eligible for the Plan's benefits. The Defendant asserts that the second determination, which was required by the Plan, was when to terminate the employee, so as to make the employee eligible for those benefits. We agree, however, with the Plaintiff, that those types of eligibility decisions are inapposite to a determination as to whether the Plan falls under ERISA.

The Court, in Gilmore v. Silgan Plastics Corp. 917 F. Supp. 685, 689 (E.D. Mo. 1996), confronted a similar argument. There, upon the announcement that the defendant plant was closing, the defendant developed a severance package which would be granted to resigning employees, who received the Plant Manager's agreement as to their resignation. The Court found that, "[a]lthough the defendant ha[d] phrased its 'severance policy' in terms of eligibility criteria, [the] defendant essentially used severance benefits selectively to entice certain employees to resign on the company's terms so that the company could fill its production needs." Id. at 677. Thus, the Court held that the only "discretion involved in [the] defendant's severance 'policy' was in deciding whether to offer severance benefits at all, rather than in deciding which employees would be eligible for the severance benefits," and that such an exercise of discretion, "did not render the severance benefits an ERISA plan." Id. We agree, for we find that the decisions, as to which employees to keep at LTV, and when, thereafter, to terminate those employees, were not the type of case-by-case determinations that would place a plan within ERISA's control.

However, we are unable to agree with the Plaintiff's view, that the Plan did not require anything of the Defendant, other than a mechanical determination that did not necessitate a case-by-case review. Once an employee was terminated, the Defendant had to

determine whether that employee was entitled to any of the supplemental benefits and, if so, which type. The Defendant also had to consider whether a generally equivalent position had been offered to that employee and, if so, whether that offer served to disqualify the employee from a benefit to which he, or she, was otherwise entitled. Accordingly, we agree with the Defendant that those determinations required a "case-by-case review of each employee's situation to determine whether the employee is both eligible for and qualifies for benefits." Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 5.

After determining that an employee has been terminated, the Defendant was obligated to ascertain whether he or she had been offered another position that would disqualify the person from all, or some, of the benefits under the Plan. In Kulinski v. Medtronic Bio-Medicus, supra at 259, our Court of Appeals recited, with approval, the reasoning of the Court of Appeals for the Ninth Circuit in Bogue v. Ampex Corp., 976 F.2d 1319, 1321 (9th Cir. 1992). There, an employer had established a plan which promised to pay severance benefits to executives who were not offered "substantially equivalent employment" upon the company's sale. Under that plan, "substantially equivalent employment" was defined as employment where the responsibilities were similar in the new position to

those in the old position. The Ninth Circuit Court of Appeals found that those criteria had to be applied on a case-by-case basis and that, as such, the program "required the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan," and could not be managed without an on-going administrative scheme. Bogue v. Ampex Corp., supra at 1321.

Likewise, the Defendant here would, on occasion, have to make a determination as to whether an employee had been offered a "generally equivalent position," which provided the same base pay, and incentive programs, as the position from which he or she had been terminated. Plan, at 2. Accordingly, the Defendant had to do more than simply "write a check," each time an employee was terminated, since the Plan required it to undertake a case-by-case analysis of each employee. While in many instances, that analysis could be brief -- since a finding that no position had been offered, or that the offered position was exactly the same as the one from which the employee was terminated, would preclude the need for any further determination -- the Plan still required that the Defendant consider each terminated employee, on a case-by-case basis, even if that consideration could be performed with dispatch.

Although we agree with the Plaintiff, that the payment of severance payments, and the determination of which supplemental benefits a person was entitled to receive, are the type of mech-

anical decisions that would not require a case-by-case review, after considering the Plan as a whole, we conclude that a case-by-case review was required in order to administer the Plan. Consequently, as we have found the Plan to be an employee benefit plan, that requires an on-going administrative scheme for the payment of benefits, we conclude that the Plan falls under ERISA. Therefore, ERISA's preemptive provisions apply, and the Plaintiff's State law-based contract claim is wholly preempted.

Our analysis does not end here, however, for, at the time of the Hearing, the Plaintiff made an oral, informal Motion, to be allowed to amend his Complaint, so as to assert an ERISA claim, if we were to conclude that his State law claims were preempted by ERISA. The Defendant objected to this Motion, and argued that the time for any such amendment had long-passed, as the Plaintiff had been placed on notice, at the time that the Defendant had removed the action to this Court, of its contention that ERISA preempted the Plaintiff's only pleaded State law claims.

Of course, once a deadline for filing a Motion to Amend a Complaint has passed, a party seeking leave to do so must satisfy the requirements of Rule 16(b), Federal Rules of Civil Procedure, which provides that a Scheduling Order "shall not be modified except upon a showing of good cause and by leave of the district court judge or, when authorized by local rule, by a magistrate

judge." Scheidecker v. Arvig Enterprises, Inc., 193 F.R.D. 630, 531 (D. Minn. 2000), quoting Archer Daniels Midland v. Aon Risk Services Inc., 187 F.R.D. 578, 581-82 (D. Minn. 1999). Rule 16(b) imposes an exacting standard, under which a party must demonstrate that, despite the moving party's due diligence, it could not meet the deadline imposed by the Pretrial Order. Rule 16(b), Federal Rules of Civil Procedure, Advisory Committee Notes -- 1983 Amendment; see also Julian v. Equifax Check Services, Inc., 178 F.R.D. 10, 16 (D. Conn. 1998). "[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992).

Here, the Plaintiff has been aware, since the removal of this action to Federal Court, that the Defendant was contending that the Plan fell under ERISA, thereby preempting the Plaintiff's claims as alleged in his Complaint. Yet, the Plaintiff offers no cogent reason why he did not, or could not have, amended his Complaint, so as to allege an ERISA claim, as an alternative cause of action, on a timely basis. As our Court of Appeals recently observed, in Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001):

> It is true that the Federal Rules are usually liberally construed to permit parties to amend pleadings, add additional parties and to similarly control the pace of litigation. See, e.g., Hopkins v. Saunders, 199 F.3d 968, 974

> (8th Cir. 1999), cert. denied, 531 U.S. 873, 121 S.Ct. 176, 148 L.Ed.2d 121 (2000); Gray v. Bicknell, 86 F.3d 1472, 1481 (8th Cir. 1996). As regards case management orders, however, the Federal Rules set a less forgiving standard. Federal Rule of Civil Procedure 16(b) specifies that such an order "shall not be modified except upon a showing of good cause and by leave of the district judge." Thus, a moving party must first make the requisite showing. Even then the district court retains discretion as to whether to grant the motion. As a vehicle designed to streamline the flow of litigation through our crowded dockets, we do not take case management orders lightly, and will enforce them. In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999), cert. denied sub nom. Rainy Lake One Stop, Inc. v. Marigold Foods, Inc., 529 U.S. 1038, 120 S.Ct. 1534, 146 L.Ed.2d 348 (2000).
>
> * * *
>
> The primary measure of Rule 16's "good cause" standard is the moving party's diligence in attempting to meet the case management order's requirements. Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992). "[T]he existence or degree of prejudice to the party opposing the modification" and other factors may also affect the decision. Id. In this case, however, we have no need to explore beyond the first criterion because the record clearly demonstrates that [plaintiff] made only minimal efforts to satisfy the CMS's [i.e., Case Management Order's] requirements.

Here, the Plaintiff offers no showing of due diligence and, therefore, his Motion to Amend is denied on timeliness grounds. However, even if the Motion were timely, we would be compelled, nonetheless, to deny his Motion as futile, as the Defendant properly

denied the Plaintiff's request for benefits under the Plan. See, Foman v. Davis, 371 U.S. 178, 182 (1962)("In the absence of any apparent or declared reasons -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave should, as the rules require, be "freely given.").

"ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." Delta Family-Care Disability and Survivorship Plan v. Marshall, 258 F.3d 834, 840 (8th Cir. 2001). In conducting such a review, a Court is to "review an ERISA plan's denial of benefits based on plan interpretation de novo unless the plan gives the administrator or fiduciary discretionary authority to determine participants' eligibility for benefits or to construe the plan's terms." Meyer v. Duluth Building Trades Welfare Fund, 299 F.3d 686, 689 (8th Cir. 2002); citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Milone v. Exclusive Health-care, Inc., 244 F.3d 615, 618 (8th Cir. 2001); Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir. 1989).

"In other words, unless the plan language specifies otherwise, courts should construe any disputed language 'without deferring to either party's interpretation." Wallace v. Firestone Tire & Rubber

Co., supra at 1329, citing Firestone Tire & Rubber Co. v. Bruch, supra at 112. If the plan does provide for such discretionary authority, then the benefits denial is reviewed for abuse of discretion. Id., citing Milone v. Exclusive Healthcare, Inc., supra at 618. Here, the parties have not addressed the issue of whether the Plan did, or did not, provide the Defendant with discretionary authority to determine benefit eligibility, but we have found no language in the Plan that expressly provides such discretion. Therefore, our review of the Defendant's interpretation of the challenged provision is de novo and, upon our close review, we find the Defendant's interpretation of the Plan to be proper.

The language at issue is contained in the second provision under the "Offer of Continued Employment with a 'CCI Associated Employer.'" As we have previously related, that provision provides as follows:

> If offered a position that is "not generally equivalent" and/or a position that requires relocation from primary residence, outside of Northeastern Minnesota, incumbent will have the option to: a) accept position with appropriate relocation assistance in lieu of basic severance pay and special retention benefits, or b) elect voluntary termination with basic and special retention benefits.

There is no dispute that the position offered to the Plaintiff at Wabush Mines, in Sept-Isles, was outside of Northeastern Minnesota. Thus, the Plaintiff claims that he was entitled to reject that job

offer, elect voluntary termination, and retain all of the benefits under the Plan, and that, therefore, the Defendant was wrong to deny him those benefits.

The Defendant argues, however, that the Plaintiff's reading of the Plan ignores the eligibility requirement found in the Plan's first paragraph, which expressly states that "salaried employees at LTV Steel Mining Company will become eligible for the [Plan] benefits by continuing to work until their employment is terminated." [Emphasis in original]. According to the Defendant, no employee becomes eligible for any benefit, until that person's employment was terminated by the Defendant. The Defendant maintains that such an interpretation makes sense given the context in which the Plan was established -- that is, being a retention device, the Plan was intended to keep key employees at LTV, by providing them with incentives, in the form of the Plan's benefits, in order to induce their stay, at LTV, after the retirement deadline of June 30, 2000. The Defendant emphasizes that, if an employee could do as the Plaintiff suggests, and voluntarily terminate his or her position and still obtain the additional benefits provided under the Plan, then it would lose the benefit of the bargain that it had made to keep those employees at the plant, after LTV's closing. Thus, as urged by the Defendant, no employee could be eligible for the Plan's benefits until such time as that employee's employment, at

LTV, was terminated by the Defendant. Here, all concede that the Plaintiff voluntarily left his position at LTV and, therefore, under the Defendant's construction of the Plan, he was ineligible for the Plan's benefits.

In response, the Plaintiff has questioned how a person could elect "voluntary termination" after he, or she, was already terminated. According to the Plaintiff, to afford meaning to all of the provisions of the Plan, the provisions must be read as he proposes. The Defendant counters by noting that the Plaintiff's reading ignores the key eligibility language, as recited at the beginning of the Plan's provisions, and that its own construction of the Plan is the only one under which each of the Plan's provisions is given substance, and internal consistency.

We agree with the Defendant that the Plan cannot be read as the Plaintiff has suggested. First, and most foremost, is the eligibility language which is provided in the provisions of the Plan, and which makes plain -- indeed, the language is underscored for emphasis -- that a salaried LTV employee only becomes eligible for the Plan's benefits by continuing to work until their employment, at LTV, is terminated. The Plaintiff argues that the provision does not say that the employment must be terminated by the Defendant, and that, since "terminated" simply means "ended," an employee, as well as an employer, could end the employment rela-

tionship. We do not take strong exception to the definition of "terminated," as urged by the Plaintiff, if we were to consider the term generally, and without context. Here, however, two critical contextual issues confront us. First, is the common meaning of the word "terminate" when it is employed to describe the end of an employment relationship. In that context, the ordinary understanding of the word is to denote the act of an employer in ending the employment relationship with a given employee. Again, in the employment context, a "voluntary termination," denotes the act of the employee in terminating his employment relationship with the employer. In this instance, given the intent and purposes of the Plan, and in the context of LTV's closure, the Plan would have no beneficial purpose to the Defendant, if an employee could quit, and still obtain the Plan's benefits. While the Plaintiff may regard his willingness to continue employment at LTV, until he decided to quit, as a benefit to the Defendant, if his reading is correct, then any employee who elected to stay at LTV for one day, and then quit, would have the same right, as that claimed by the Plaintiff, to receive Plan benefits, thereby depriving the Defendant of the benefit of its bargain. To hold otherwise would be to alter the manifest purpose of the Plan.

In so construing the Plan, we have not overlooked the Plaintiff's query as to how an employee, whose employment had already

been terminated, could ever "voluntarily terminate" his employment relationship. We see little but semantics in the query.[9] Plainly, the Plaintiff retained an employment relationship with the Defendant until he voluntarily elected to resign from that relationship. He did not leave his employment by edict of the Defendant -- that is, he was not terminated -- he chose to work with a different employer at a time that suited him, and not the Defendant. Had he continued to work with the Defendant until his employment was no longer needed by the Defendant, then he would not have had to file this lawsuit, as all concede that, under such a circumstance, the Plaintiff would be entitled to benefits under the Plan.

Having read the Plan as an integrated whole, giving meaning to all of its provisions so as to render none superfluous, or nugatory, we conclude that the Defendant's interpretation of the Plan is proper, under de novo review, and provides the Plan with a logical meaning.[10] This reading gives effect to the purpose of the

---

[9]While the Plaintiff is dubious that one can be "terminated," after he has been advised that his employment will not be further needed because of his plant's closure, we find the argument to be more abstruse than substantive. An employee can be informed that his employment will be terminated effective on some later date. If, prior to that later date, continued employment is offered, and rejected, or is accepted, and then the employee resigns, a termination is effected, either as compelled by the employer, or as voluntarily elected by the employee.

[10]Notably, the Plaintiff does not offer any evidence, parole
(continued...)

Plan in providing incentives for key employees to be retained, even after LTV's closure, and at a time when both the Defendant, and the retained employee, are aware that the employment relationship will not long continue absent the Defendant's offer of further employment at one of its affiliate facilities. If the offered position is a non-equivalent position, or is one requiring a relocation, then the retained employee has two choices: 1) take the job and become ineligible for the Plan benefits; or 2) decline the job offer, and elect to be terminated. Here, the Plaintiff refused a job offer, returned to work with the Defendant for a period of time, and then, on his own, elected to terminate his relationship

[10](...continued)
or otherwise, beyond his reading of the Plan, to suggest that the Defendant misinterpreted the Plan's provisions. In fact, quite to the contrary, the Plaintiff has raised, as his sole argument in support of his Motion for Summary Judgment, the assertion that the Plan is **un**ambiguous, and that, under its plain terms, as he reads them, he is entitled to benefits. See, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 5-9. Notably, in his deposition testimony, the Plaintiff admitted that, prior to the day that he first asked for benefits under the Plan, he had not spoken with anyone at the Defendant company, "about their interpretation of the meaning of the provisions in" the Plan. See, Deposition of Leonard Rosati, attached as Exhibit to Affidavit of W. Eric Baisden, at 447-48. When he was afforded, by LeRoux, with the Defendant's interpretation of the Plan, he continued to work for the Defendant for another four months until he chose to end his employment with the Defendant. Accordingly, the Plaintiff has not so much as suggested that anything supports his interpretation of the Plan other than his own reading.

with the Defendant in order to accept employment with a different employer.

The construction urged by the Plaintiff, ignores, or renders meaningless, the eligibility language contained in the first paragraph of the Plan. More importantly, the Plaintiff's reading of the Plan would destroy its essential purpose by rewarding a key employee with Plan benefits, even if that employee worked only one additional day, after the closing of LTV, with little or no benefit to the Defendant. Although the Plaintiff appears to argue that the one additional day constitutes such a benefit, he was remunerated with wages for that additional day. The purpose of the Plan was to reward those who remained, after the LTV closure, until such time as the Defendant no longer needed that employee's service. Accordingly, we deny the Plaintiff's informal Motion for leave to amend his Complaint as untimely but, even if we reached the issue, we would find the Motion to be futile.[11]

NOW, THEREFORE It is --

ORDERED:

1. That the Defendant's Motion for Summary Judgment [Docket No. 27] is GRANTED.

---

[11]Having reached this decision, and the decision that the Plaintiff's State law claims are preempted by ERISA, we need not, consider the merits of the Plaintiff's Motion for a Jury Trial, which we deny here, as moot.

2. That the Plaintiff's Motion for Summary Judgment [Docket No. 21] is DENIED.

3. That the Plaintiff's Informal Motion for Leave to Amend his Complaint is DENIED.

4. That the Plaintiff's Motion for Jury Trial [Docket No. 20] is DENIED, as moot.

5. That the Clerk of Court is directed to enter Judgment in favor of the Defendant.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE